543 P.2d 158

**SCOTTSDALE DISCOUNT CORPORATION and Schenectady Discount Corporation, Appellants and Cross-Appellees,**

v.

**Alan T. O'BRIEN and Barbara O'Brien, Appellees and Cross-Appellants.**

**No. 2 CA–CIV 1907.**

Court of Appeals of Arizona, Division 2.

Dec. 10, 1975.

Miller, Pitt & Feldman, P. C. by David J. Leonard, Tucson, for appellants and cross-appellees.

Stuart Herzog, Tucson, for appellees and cross-appellants.

## OPINION

KRUCKER, Judge.

This was an action by appellees and cross-appellants, Alan T. O'Brien and Barbara O'Brien (hereinafter "O'Brien"), against appellants and cross-appellees, Scottsdale Discount Corporation and Schenectady Discount Corporation. On a prior appeal, we reversed summary judgment for Scottsdale Discount and remanded for trial on the merits. See *O'Brien v. Scottsdale Discount Corporation*, 14 Ariz. App. 224, 482 P.2d 473 (1971). On remand the trial court denied all relief on O'Brien's complaint and Scottsdale's

counterclaims. The trial court also declared the amount of the balance in certain Dealer Reserve and Holdback accounts that had been established during the transactions between the parties. Finally, the trial court ordered that a judgment Scottsdale recovered against O'Brien in 1969 be satisfied by charging it against the Dealer Reserve account. Scottsdale now appeals from the entire judgment, and O'Brien cross-appeals from that part of the judgment declaring the balances in the Dealer Reserve and Holdback accounts. We affirm as hereinafter modified.

The operative facts are as follows. Scottsdale Discount Corporation was formed in Arizona in 1962 and dissolved in 1969. During its existence it was a wholly-owned subsidiary of Schenectady Discount Corporation, a foreign corporation qualified to do business in Arizona. When Scottsdale Discount dissolved, all its assets and liabilities were transferred to and assumed by Schenectady Discount. Since Scottsdale Discount's dissolution, Schenectady Discount has been doing business in Arizona as "Scottsdale Discount."

Scottsdale was in the mobile home financing business. This activity included purchasing conditional sale contracts on mobile homes and financing inventories for mobile home dealers (called "floor-planning").

O'Brien and one C. W. Moore formed a partnership known as Mickey and Al's Mobile Homes in November of 1964. The partnership commenced doing business as a mobile home dealership in Tucson. After a few months, O'Brien acquired all the partnership assets and liabilities and continued to operate as a sole proprietor.

From the start, Scottsdale financed the dealership's inventory and purchased retail installment contracts generated by its sales activities. To secure the dealership's obligations to Scottsdale, the parties agreed that Scottsdale would hold a portion of O'Brien's share of the anticipated contract finance charges in a "Dealer Reserve Account." Each time Scottsdale bought a retail installment contract from O'Brien, Scottsdale credited the Dealer Reserve Account with a part of the anticipated finance charge equal to five percent of the unpaid principal balance on the contract. The parties also established a "Holdback" account as additional security for Scottsdale. For certain contracts Scottsdale was unwilling to advance O'Brien the entire purchase price. In those instances the difference between the purchase price and the amount actually paid to O'Brien would be credited to the Holdback account. The balance of the Holdback account was to be paid to O'Brien at a later date.

The Dealer Reserve Agreement also provided that if O'Brien sold less than five contracts to Scottsdale during a calendar year the reserve accounts would be held until all payments on assigned retail contracts had been received.

From November 1, 1964 to June 30, 1965, Scottsdale bought approximately 70 contracts from Mickey and Al's Mobile Homes and O'Brien. The terms of each sale included an undertaking by O'Brien to guarantee payment to Scottsdale of all sums due under the contract. In addition, Scottsdale and O'Brien entered into a "long-form guarantee" agreement at the commencement of their dealings, the legal effect of which is considered *infra*.

Twenty of the contracts bought by Scottsdale went into default. In each case Scottsdale repossessed and sold the collateral for less than the balance due under the contract. Accordingly, Scottsdale counterclaimed in this action for the deficiency amounts based on O'Brien's guarantee.

The trial court denied relief on the counterclaims, holding that Scottsdale had failed to comply with the statutory procedures for resale and thus could not recover on O'Brien's guarantee. The court declared that the balance remaining in the Dealer Reserve Account must be reduced from $14,416 to $4,121, and that the balance in the Holdback account was $12,987.

## SCOTTSDALE'S APPEAL

■ Scottsdale first contends that a contract assignee's violation of the resale provisions of the Uniform Conditional Sales Act, in effect in Arizona at the time this case arose, does not discharge the obligations of the buyer's guarantor. Scottsdale accordingly concludes that even assuming it violated A.R.S. Sec. 44–319 et seq., in disposing of repossessed mobile homes, thereby precluding recovery of the deficiency from the buyer, it could still recover against O'Brien as guarantor. We think this contention is incorrect.

The general rule is stated in 38 Am.Jur. 2d, Guaranty, Sec. 89, at 1095:

"The guarantor is, as a general rule, released or discharged of liability where, by reason of some act or omission on the part of the creditor, the principal debtor has become discharged of his obligation by a rule of law, even though there has been no payment of the principal obligation."

As it is stated in 38 C.J.S. Guaranty § 83, at 1253:

"The general rule has been applied in cases arising out of conditional sale contracts where the vendor, after breach, recovers the property under such conditions that the vendee is released; in such a situation the release of the vendee also releases one who has guaranteed the vendee's performance of his contract."

The text cites *Commercial Credit Co. v. Phoenix Hudson-Essex, Inc.*, 33 Ariz. 56, 262 P. 1 (1927), as an example. In *Commercial Credit* the plaintiff periodically bought conditional sale contracts from the defendant, a car dealer. On one occasion, plaintiff bought a contract formed between defendant and one Applegate. Pursuant to the assignment, defendant guaranteed Applegate's obligations under the contract. Applegate defaulted and plaintiff repossessed his car. Instead of reselling, plaintiff stored the car and shipped it to defendant. Plaintiff subsequently sued defendant on the guaranty. The court sustained defendant's demurrer, holding that plaintiff's failure to make a statutory resale of the car discharged defendant's guaranty obligation. It stated:

"It is, of course, a well-recognized principle of law that the release of a principal debtor without the consent of the guarantor releases the latter from his guaranty.

\*    \*    \*    \*    \*    \*

Plaintiff having pleaded that it had parted with the automobile to another for a valuable consideration, under circumstances inconsistent with a statutory resale, it was in effect an allegation that it had elected to deal with the goods as its own property, and in such case, by the terms of section 23, *supra,* the buyer was discharged of any obligation under the contract. Such being true, the guarantor was discharged from its original obligation to pay the debt of the buyer. The complaint therefore shows affirmatively on its face that defendant was not liable on its original guaranty and plaintiff did not state a cause of action in its complaint on said guaranty." 33 Ariz. at 59, 61, 262 P. at 2.

See *Beck v. Shepherd Fruit Co.*, 19 Cal. App.2d 590, 66 P.2d 188 (1937); *In re Orpheum Circuit, Inc.*, 23 F.Supp. 727 (S.D.N.Y.1938), aff'd 97 F.2d 1011 (2d Cir. 1938). We conclude from *Commercial Credit* that if Scottsdale violated the statutory resale provisions in disposing of repossessed mobile homes, it forfeited the right to recover on O'Brien's guarantee.

Scottsdale strenuously contends, however, that *Maestro Music, Inc. v. Rudolph Wurlitzer Co.*, 88 Ariz. 222, 354 P.2d 266 (1960), would support a different result. In that case Maestro sold coin-operated phonographs for Wurlitzer. Maestro sold Stevenson certain Wurlitzer phonographs under conditional sale contracts. Stevenson executed three promissory notes to Maestro, who in turn endorsed them to Wurlitzer in exchange for their face amounts less a reserve fund. Maestro also

assigned the contracts to Wurlitzer and agreed to guarantee Stevenson's payment thereunder. Maestro agreed that Wurlitzer could release any and all rights under the contracts without affecting Maestro's liability. Stevenson experienced financial difficulty and surrendered the phonographs to Wurlitzer for $5,000. Wurlitzer resold them without complying with the UCSA resale provisions and sued Maestro for the deficiency. The court held that the resale irregularities did not operate to discharge Maestro because Maestro had specifically agreed to remain liable even if Stevenson were released. Because the UCSA resale provisions were intended to protect only the buyer, the court stated that Maestro's agreement to remain liable was not contrary to public policy. It also stated:

" . . . in the absence of the special circumstances . . ., Maestro would be relieved from liability, because the absence of a resale as prescribed by the Uniform Conditional Sales Act would discharge both Stevenson (see A.R.S. Sec. 44–323) and Maestro (see Sec. 44–520). See also *Commercial Credit Co. v. Phoenix Hudson-Essex, Inc.,* 33 Ariz. 56, 61, 262 P. 1 . . .." 88 Ariz. at 232, 354 P.2d at 272.

We think it is clear that Maestro was held liable on its guaranty solely because it agreed to remain liable notwithstanding release of the buyer. The rationale of *Maestro Music* does not support Scottsdale's contention that a guarantor should be held liable in similar circumstances even in the absence of such an agreement. *Stevens v. Southwestern Investment Co.,* 1 Ariz.App. 88, 399 P.2d 709 (1965). We note that it is irrelevant whether the UCSA resale provisions are intended to protect persons other than the buyer. O'Brien is discharged not by operation of the UCSA, but under well-settled law of guaranty.

■ Scottsdale next contends that the long-form guarantee was in effect an agreement by O'Brien to remain liable notwithstanding release of the buyer. We dis-

agree. The long-form guarantee is by its terms an undertaking by O'Brien and C. W. Moore individually to guarantee payment of the present and future obligations *of the partnership.* There is no basis whatever on which to construe the long-form guarantee as a blanket guarantee by O'Brien of the obligations of conditional vendees of mobile homes.

■ We note that the following guarantee which accompanied each assignment also fails to support Scottsdale's contention:

"GUARANTEE. Undersigned guarantees prompt and full payment of all sums due according to the tenor of the within contract, to the holder hereof, and, in event of default, authorizes any holder hereof to proceed in favor of the holder hereof and against the undersigned, for the full amount due including attorney's fees, and hereby waives presentment, demand, protest, notice of dishonor and any and all other notices or demand of whatever character to which the undersigned might otherwise be entitled. The undersigned further consents to any extension granted by any holder and waives notice thereof. The undersigned hereby acknowledges receipt of a true copy of this guarantee."

Although under this provision the guarantor waives notice and demand and consents to any extensions given by the holder to the buyer, he does not promise to remain liable where the buyer is discharged.

We conclude that O'Brien made no agreement which would bring this case within Maestro Music, supra. Accordingly, if Scottsdale violated the UCSA resale provisions, it cannot recover the deficiency from O'Brien.

■ As might be expected, Scottsdale contends the trial court erred in holding that it violated the UCSA resale provisions. The trial court found as follows:

"19. The counterclaimant Scottsdale attempted to hold public sales under the Uniform Conditional Sales Act and to

establish deficiency judgments regarding these contracts.

20. With respect to counterclaims 4, 5, 7 and 17, Scottsdale clearly and admittedly released the buyer of any deficiency and therefore released O'Brien. With respect to the other counterclaims, there is no evidence that proper notice of sale was posted and the property being sold was not available for inspection at the place of sale."

A.R.S. Sec. 44-323, in effect at the time this case arose, provided that where the seller of goods on a conditional sale contract does not resell the collateral after repossessing it, the buyer is discharged of all obligation. Under A.R.S. Secs. 44-319 and 44-320, resale means sale "at public auction" within 30 days after repossession. What we must determine, therefore, is whether the actions Scottsdale took with respect to the mobile homes it repossessed constituted sale "at public auction."

It appears to be undisputed that although Scottsdale's notice of sale stated the location of the repossessed mobile homes and interested bidders were allowed to see them, the mobile homes were never actually present at any of the sales held by Scottsdale. Scottsdale urges that the UCSA did not require bulky items to be within view of bidders at the place of sale. In support of this proposition it cites *Emery's Motor Coach Lines, Inc. v. Mellon Nat'l Bank & Trust Co.*, 136 W.Va. 735, 68 S.E.2d 370 (1951). In that case the plaintiff borrowed money from defendant and executed a note secured by a deed of trust on certain motor buses. Plaintiff defaulted and defendant directed the trustees to sell the collateral. The collateral was not present at the sale. Although the court held the sale was void for other reasons, it stated:

"The plaintiffs urge that the trust property should have been present at the place and on the day of sale. It is the ordinary rule that personal property subjected to sale under a deed of trust should be physically present at the place

and time of sale so as to enable those attending the sale, if they so desire, to inspect the property. *Charleston Milling & Produce Co. v. Craighead,* 116 W.Va. 194, 179 S.E. 69. See Annotation, 69 A.L.R. 1194. *The same rule is applicable to property subject to sale under provisions of the Uniform Conditional Sales Act. Commercial Inv. Trust Co. v. Browning,* 108 W.Va. 585, 152 S.E. 10. *But in the instant case the property included a large number of motor vehicles which, at the time and day of sale, were being used in transportation of passengers in one or more states. It would have disrupted the public service, which the company was obligated to furnish, to assemble all of such motor vehicles at the place of sale.* Moreover, an exhibition of the certificates of public necessity and convenience at the place of sale would have served no real purpose. We think that the situation in this case calls for an application of an exception to the general rule: 'The need for some exceptions and their range must depend upon considerations of policy and fairness that cannot be formulated with precision in advance of the event. At times the thing to be sold may be too bulky to be brought within the view of bidders, as, for example, upon a sale of a ship.' *Manhattan Taxi Serv. Corp. v. Checker Cab Mfg. Corp.,* 253 N.Y. 455, 171 N.E. 705, 706, 69 A.L.R. 1190." 68 S.E.2d at 376 (Emphasis added)

*Emery's Motor Coach* is easily distinguishable from the case at bar. The collateral in *Emery's Motor Coach* was continuously on the move in interstate commerce. It would have been wasteful, inconvenient and detrimental to the public to require it to be assembled in one place for sale. In contrast, the mobile homes in the instant case were unoccupied and wholly idle. There were no exceptional circumstances that would have made it impracticable to have held the sales where the mobile homes were stored. We think that in the absence of such exceptional circumstances the sale

conducted by Scottsdale was not "at public auction" within the meaning of A.R.S. Secs. 44–319 and 44–320. See *Commercial Investment Trust v. Browning*, 108 W.Va. 585, 152 S.E. 10 (1930).

■ Scottsdale cites *Manhattan Taxi Service Corp. v. Checker Cab Mfg. Co.*, 253 N.Y. 455, 171 N.E. 705 (1930) for the proposition that if the notice of sale states where the goods are located and gives an opportunity to view them, a sale in the absence of the goods is sufficient under the UCSA. We disagree. *Manhattan* cannot be read to say that giving notice of the location of the goods is sufficient per se to excuse their presence at the sale. We think *Manhattan* merely stands for the view that where the presence of the goods is excused due to exceptional circumstances, the notice of sale must at least state where the goods are located.

Since we hold that all the sales conducted by Scottsdale violated A.R.S. Sec. 44–319 et seq. because they were not held in the presence of the collateral, we need not consider whether there was evidence that proper sale notices were posted.

■ Scottsdale's final contention requires some additional facts. In 1969, Scottsdale recovered a judgment against O'Brien in Maricopa County on two inventory trust receipts. As of the date it was entered, the total amount of the judgment including interest and costs was $5,829.40. Scottsdale attempted to collect the judgment from O'Brien but failed. In the judgment in the instant case, the trial court ordered that the Maricopa County judgment be satisfied as of the date of entry by deducting $5,829.40 from the Dealer Reserve account.

Scottsdale now contends this was error and we agree. It is true that the Dealer Reserve account was intended in part to secure inventory financing claims of Scottsdale against O'Brien. It does not follow, however, that Scottsdale was bound to look solely to the Dealer Reserve account for satisfaction of judgments on such claims. Indeed, the Dealer Reserve agreement indicates that Scottsdale was entitled to retain the entire amount in the Dealer Reserve account until all the conditional sale contracts it had purchased were paid.

The testimony of O'Brien's witnesses indicated that charging the Dealer Reserve account was within the finance company's discretion. They testified that it would be reasonable and proper to charge the judgment to the Dealer Reserve account as of the date it was entered. From this O'Brien draws the conclusion that the judgment *should* have been charged against the Dealer Reserve account and that Scottsdale "abused its discretion" in failing to do so. We too think that the decision whether to charge the judgment against the Dealer Reserve account was within Scottsdale's discretion. The conclusion we draw, however, is that the trial court erred in compelling Scottsdale to do so.

## O'BRIEN'S CROSS-APPEAL

■ In declaring the existing balance in the Dealer Reserve account, the trial court deducted $10,294.40 from the original balance. This $10,294.40 charge consisted of two components. One was Scottsdale's $5,829.40 Maricopa County judgment, discussed supra. The other was a charge-back of $4,465 for O'Brien's share of finance charges rebated to mobile home buyers. $1,600 of the $4,465 represented rebates made to buyers who had paid their contract debts in full before maturity. The remaining $2,865 represented rebates made to buyers who had defaulted and whose mobile homes had been repossessed and resold.

O'Brien contends on cross-appeal that the $4,465 charge-back was improper. We disagree and hold that the trial court properly took the $4,465 charge-back into account in declaring the existing balance in the Dealer Reserve account. The Dealer Reserve account represented part of O'Brien's share of anticipated finance charges to be realized in the future as

payments were made under conditional sale contracts assigned to Scottsdale. The Dealer Reserve agreement defined the Dealer Reserve as the "[n]et portion of finance charge on Conditional Sales Contracts allocated to dealers' reserve account." It also provided that the "[a]mount of dealer reserve is set forth in memo of Schenectady Discount Corporation and its wholly owned subsidiary, Scottsdale Discount Corporation dated ————."

The memo was apparently not introduced at trial.

O'Brien testified at trial that losses sustained by Scottsdale on inventory financing or on conditional sale contracts were to be charged to the Dealer Reserve and Holdback accounts, and that it was fair to do so. We think the evidence would support a finding that the parties agreed that O'Brien's pro rata share of amounts rebated to mobile home buyers could be charged back against the Dealer Reserve account.

We think the trial court properly took the $4,465 into account for another reason. As we noted above, the Dealer Reserve represented a portion of O'Brien's share of anticipated finance charges to be realized in the future. Periodically it developed that, because of prepayment or repossession, part of the anticipated finance charge on a particular contract would in fact not be earned. For the Dealer Reserve to continue to be a proportional representation of O'Brien's share of anticipated finance charges, it would have to be adjusted to reflect the fact that the amount of anticipated finance charges was less. For this reason we think the charge-backs were impliedly authorized by the Dealer Reserve agreement even though not specifically provided for.

O'Brien also argues that if any charge-backs are allowed, they should be limited to those arising from payments before maturity. He bases this argument on A.R.S. Sec. 44–292, which requires a rebate only to the buyer who pays in full before maturity and not to the buyer who defaults. We reject this argument. Since the charge-backs were solely a matter of agreement between the parties, A.R.S. Sec. 44–292 is irrelevant here.

The judgment is reversed insofar as it required satisfaction of Scottsdale's Maricopa County judgment by means of a charge against the Dealer Reserve account, and is otherwise affirmed. Paragraph four of the judgment is modified to read: "As of March 3, 1973, the balance in the Dealer Reserve Account was $9,950.40 and the balance in the Holdback Account was $12,987."

HOWARD, C. J., and HATHAWAY, J., concur.